Good morning and may it please the court, James Treglia appearing on behalf of the appellants. I would like to reserve five minutes of my time for rebuttal. Very well. So, briefly we'll talk about the case itself. This is a case about talcum powder and the sale of talcum powder in the state of California. And as we were bringing this case, the one thing that stands out to me is as we brought this case and as information about the potential contaminants within talcum powder became known to the public, the sale of this product dropped precipitously. I'm going to interrupt you with a procedural question. Sure. Do you agree that we're not talking about further amendments to the complaint? You're talking, you agree the seventh complaint is as good as it's going to get and you want us to reverse the district court's determination that you did not meet the pleading standards. Correct. And that's the complaint you want to proceed on. You're not saying, it shouldn't have been with prejudice, I should have gotten my eighth chance. Actually, I think I was at the fifth, not the seventh. I'm sorry. I added a couple. That aside, no. No, because I think the issues raised are going to have to, need to be addressed one way or another. And so, going further, a further amendment here or there I don't think is necessary. I would say factually, though, as we. I think we understand the situation with the talcum. The, what, I gather that during the class period, the problem is the district court hears is that there was, your plaintiff just didn't really match up with the ads or statements that she, they were reporting to have seen or so on. The ones that were clearest about the talcum powder issue were around when this whole issue arose in 2018, when there was, when Johnson, when the company made distinct statements about there was, they were safe, there was no danger and so on. But you don't have any allegation that you saw those ads. So we don't. And the problem we have is, and this is inherent with this particular product, is this is a product that was for sale to the public, at least with regards to baby powder, for over 100 years. With regards to the shower-to-shower product, that was for sale for over 50 years. And both plaintiffs allege their complaint is that this was a product that they just bought. This was just something they bought as part of their regular day. And you can imagine a product that's out for sale for over 100 years isn't just going to be in the home of the plaintiffs. It was in the home of their parents. It was in the home of their grandparents. But this is a false advertising place. It is a false, well, I think. And there may have been false advertising 80 years ago, 50 years ago, 25 years ago. But don't you have to plead some false advertising in the class period? So yes and no. And I think this is – and to give that point, I think – two points there. One, I think there is a strong emission. Well, count our hopes. Yes. Is the judge going to be sort of somehow get this from osmosis? How are they going to know what's being claimed? And let me clarify that point. So yes, if it's a strict false advertising case. We're also making an emissions claim here, which is that, hey, there should have been a state – there should have been a warning. But the legal issue with regard to that is the Prop 65. And so let me – and I thank you for bringing that up because I was going to address that point. The Prop 65 question, which is out there. There are a number – the three – or actually four recent cases that have come down out of – unhelpfully for me, the Southern District of California dealing with the sale of dark chocolate and the presence of contaminants there involving heavy metals. And in those cases – Involving what? Heavy metals. Excuse me. Like cadmium, lead. Similar to in this case that we have asbestos, asbestos is fibers. There's arsenic, et cetera. There's similar heavy metals. And there the scenario – and let me give you quickly the names of these cases. We have the Grouse versus Hershey case. Wait. Have you cited these? I have not because they just came down in a lot very recently. Yes, and you should have sent in 28 June. And I can probably do that process. Would you please just – and the other thing you can do now when you leave is hand in a list of the cases, or you could have done it today. We have a form for that. We'll be happy to provide that. It's not very useful to give us cases now. We're not going to be able to. I appreciate that, and I apologize for that. But there are four cases, including two, that just came down approximately. The one came down March 31, et cetera. So these are fairly recent cases, all dealing with the sale of dark chocolate. And there, there seems to be a general consensus that the Prop 65 issue – Prop 65 itself is there primarily as a warning label, as that warning label for cancer-causing issues. But it's also – but it's not supposed to be a bar to other claims involving any other health issues. And that's – and one of the points, I think, that was raised in, again, the case that came down March 31 was this issue. Okay, yes, the dark chocolate or the heavy metals in the dark chocolate causes cancer and causes a problem, but it also causes other issues, and that's certainly what we've alleged in our complaint as well. So, yes, asbestos does cause cancer. I guess my problem – I've reviewed the complaint, and God knows the district court has here too. It seems to me that there are sort of cursory statements about the plaintiffs having viewed, having relied, and that they were exposed to the marketing campaign. Tell me in the complaint where, where, when, how the plaintiffs were exposed to that advertisement. Is it in there? And if it is, tell me where. So it's not specifically in there because, again, we can't point to a specific – we can't point to a specific advertisement need that they could rely on. Again, this is a product that was for sale for over 100 years. Are there any advertisements within the class period that you can point to that they – that were prevalent? We can point to advertisements during the class period that were prevalent, and we attach those exhibits to the complaint. But not that they viewed them. But – and not that they viewed them. And that's – and, again, this is the problem. The problem that you have is the product that they're walking into a grocery store or a CVS or whatever, and they're purchasing. And that's where we come back to the in-rate tobacco too issue, which is you're having a marketing campaign that goes on for so long that how do you point out which one when they first decided to start buying this product, a product that they've bought over and over and over and over and over again throughout the course of their lifetime? And that was the issue. One of the primary issues in in-rate tobacco too was, okay, how do you point to an exact advertisement for someone in the class period when the person was purchasing the product? It doesn't seem that difficult to allege that from 2015 to 2019 or whatever the exact class period is, I saw ads of this company that said – you don't need dates. You don't need particular ads. But that said XYZ, that said pure, that said that they were safe, that there was no calc problem. And there's no such allegation. I mean, even without specifying a particular ad, without specifying a particular date, or even that during the class period I saw lots of ads that conveyed the message that this was safe and pure and didn't have – and a talc was safe. There's nothing even like that. But, again, this falls back into the problem. How do you – how can we possibly make that argument or make that statement in compliance with Rule 11 and requiring it to be truthful? And yet we have class members who – or the plaintiffs can't point to a particular ad because there's something – But I just said you don't need – let's assume you don't need a particular ad. You need some message that was conveyed during the class period with something that the defendant said somewhere or other that – Apologies. We do have those statements. We have marketing statements that are made during the class period as a – But not that your plaintiffs saw them or knew about them or had anything to do with them. That's – and, again, that's true. But, again – but in that – but also I would say to some degree here you're talking about an extended class period as well because it's not necessarily just four years. You're talking about an extension because you have a very long campaign, which is alleged in the complaint, of hiding the ball, of hiding the potential contaminants in these products. And so – But what it amounts to is that sometime before the class period, these people developed the understanding that this was a safe product and they continued to buy it and they didn't really look at any ads during the class period. That's correct. And so the question is – so this is clarifying because if that's your theory, the question is can we – is that a legally viable theory? So I think it is given the nature – and, again, these are where the concept of omissions and the concept of these affirmative statements somewhat blend together because we're talking about material facts here. The presence of these contaminants were material facts. There's no question about that. As soon as people were aware of the fact that there were contaminants in these products, they stopped buying them. And as we allege in the complaint, Bausch pulled the product from the market based on that. We couldn't allege that for JJCI because JJCI pulled it off after we filed our fifth amendment complaint. But there's no question that this was a material fact for all consumers of the presence of these contaminants. And, again, we go back to this question of Prop 65. The consensus seems to be that if there are harms caused to the body that are in addition to just cancer or reproductive harms, that those – then you can move forward into an omissions case because, again, in the words of it – because, obviously, these products that cause – that may eventually cause cancer also are causing other harms. In the case of what we cite in the fifth amendment complaint, it was – it creates inflammation and cellular oxidation, which could eventually lead to cancer. It doesn't always. There's also risks of asbestosis, et cetera. And so we allege all those things in the complaint. The key point, then, is we then go back into the – we then look into our analysis on omissions. But now you're in Prop 65. But then I'm in Prop 65. Well, let me – and let me say, again, I think there are two primary theories here. Number one, we have a – we have an omissions issue. But, number two, we do have misstatements made over a period of time, going back in some cases 50 years, in some cases going back 100 years, that are consistently deceptive because they hide the fact that it contaminates. You keep switching gears. We should get to the Prop 65 question. Sure. Or we do. Right. In Enri Tabacco 2 cases, that case did say that they don't have to look at a particular misrepresentation. But it also said that they must allege that the defendant's misrepresentations was an immediate cause of the injury-causing conduct, right? But not any particular one. So what in Enri Tobacco supports your theory that they didn't have to do that either? So, again, right during the class period. And so – right. And so Enri Tobacco 2, you're talking about, obviously, the sale of tobacco products and people eventually getting addicted to those products. And then the question is, okay, how can you ask someone to go back prior to their addiction to pick out which ad it was when that may have been 30 years down the line? What I can say is consistently across the time period for these talcum powder products, the consistent message was they're safe. They're safe for use. And then, as we mentioned in the complaint, the products are placed out on store shelves and, in the case of baby powder, placed with the infant on it, placed in the infant bag. You want us to consider that part of advertising, the product placement. Product placement, absolutely, because product placement is an important part of advertising. It's why retailers – why manufacturers have planograms, which we allege in the complaint. So a planogram – and they work these out with the retailers. And the products are placed in very specific locations. And they're designed – the locations are designed so that they increase the sales. And it is also the case that the placement of a product on a shelf can be deemed to be deceptive and give some sort of warranty or some sort of affirmation that the product is safe and usable to the general public. Did either of your plaintiffs allege that the product placement had something to do with their purchase? They did, yes. All right, counsel, did you want to save some time? I do, thank you. Good morning, Your Honor. It may please the Court. Naomi Scotten for LLT, formerly JJCI. The district court gave plaintiffs six opportunities to plead their claims, as we've discussed. And in dismissing the third amended complaint, it provided a – Speak into the mic more, please. Apologies, Your Honor. I'm having trouble hearing you. Thank you. It provided a very clear roadmap for exactly what they needed to do to plead their claims with sufficient specificity. They needed to allege reliance with particularity. They couldn't just plead around Prop 65. And if they thought there was something unsafe about the product, they needed to explain that in their complaint. They pled a fourth amended complaint and then a fifth amended complaint, but it still failed for those same basic reasons. They didn't plead reliance with sufficient particularity. They were pleading around Prop 65, and they didn't say what was unsafe about the product in their complaint. For those reasons, the Court was correct to dismiss with prejudice. I'd like to start with reliance. Your Honors have correctly identified they did not plead exposure to a long-term advertising campaign with sufficient specificity. Well, they did plead an exposure to a long-term advertising campaign. The question is whether it had to be within the class period. I'm looking at the In Re Tobacco opinion. It doesn't seem exactly to deal with that question, but it does seem to assume that the injury of continuing to purchase it had to be within the class period, but that the exposure didn't necessarily have to be within the class period. I agree, Your Honor. I think that the exposure could extend back. The problem here is that the complaint doesn't allege that either. If you look at the complaint and what they actually allege in terms of exposure, they do not say, I saw websites. They do not say, I saw social media. They do not say, I saw press releases. If you look at 2ER188 paragraph 96, that's about as specific as it gets, and there they say they were subject to television advertisements along with the rest of the class. That's not even saying, I saw them. It's kind of just saying, I existed at the time that the TV ads existed, and then it kind of vaguely suggests they were also subject to print ads, but it isn't even quite saying that. They do address three specific TV ads that they say they saw, but those failed the reasonable complaint. This is a little off record, but are there other cases on this issue pending around? Are there other UCL actions? On the talc issue? Not to my knowledge. I see. I will say that there's another Prop 65 action that mirrors this action where plaintiffs alleged that there were dangerous levels of contaminants in the product. That was the Hermelinda Luna case we mentioned in our brief, and in that case, plaintiffs' lawyers actually paid JJCI $600,000 to dismiss the case. I believe it was an attorney's fees after their own expert's report demonstrated the amounts of alleged contamination. In other words, the plaintiff's experts alleged fell within Prop 65 safe harbor levels. So even when these cases are litigated, there is no merit there. The problem here is just the plaintiffs didn't satisfy Prop 65's notice requirements, so we haven't gotten that far. And then as to the separate affirmative representation claims, these plaintiffs haven't said that they saw them, so there's just a failure to allege exposure there. Just to be clear, your claim, you're not contending that they had to allege that they saw ads generally within the class period, but you're saying they didn't see, they didn't allege that they saw any ads ever, essentially. I think they have to allege that they were misled within the class period, and so I think that the advertising campaign, I mean, it should extend into the class period so that there's a connection between the actual purchases at issue. I think it can extend. I mean, they continued to purchase during the class period based on what they'd seen previously, let's say, but you say that that hasn't been said either. No, there's just no specificity. Again, it's about exposure here. Which was the paragraph you said you thought was the closest? I think it's 96. It's at 2ER188. Again, it says in that paragraph that they were subject to ads along with the rest of the class members. It's not even saying they saw them. And if you look at the cases in state court that are applying this, even putting aside Rule 9b's specificity requirements, they're requiring much more that's in this complaint. For example, plaintiff's case, it's Morgan. There, plaintiffs were saying we were deceived by AT&T's ads about its phones and its networking. There, they said we did research about these plans. We looked it up online. We came into contact with press releases. I talked to other people who had seen them, and then we went to the store, and the things that I saw reinforced what I had seen. So there are very specific allegations, even just in state court, about how they came into contact with it. If you look at Boken, it's a tobacco case that In Re Tobacco 2 was sort of incorporating the standard from. There, plaintiffs were saying we saw billboards. There were tobacco ads from the time of my childhood everywhere. They were on sports cars, racetracks, sporting events, just everywhere. I was inundated with them. There's just absolutely nothing like that here that explains how plaintiffs came into contact with a long-term saturation advertising campaign. And if you look at the things that they're pointing out in their complaint, they're not saying they saw them. For example, press releases, all of the press releases that are attached as exhibits to their complaint were released after they admit that they stopped using the product. They were in response to the Reuters article that they said caused them to stop using the product. So this is not a case where they have sufficiently alleged reliance because they have an alleged exposure to a long-term advertising campaign. Another case that's helpful, Judge Tiger's opinion, and Operman, is it your position that to come within the Tobacco 2 long-term pervasive advertising campaign that the campaign has to continue at least to the class period, or can it all be previous? So I think it does have to continue to the class period. There has to be an actual connection with the purchases. I mean, these are claims that are subject to a three- and four-year statute of limitations. So you actually have to be misled within the class period. I think that's why the class period here starts in 2015. The complaint, I believe, was filed in 2019. I'm confused. I thought you said that they didn't. Maybe they're just misled because they had seen these things earlier. I thought you said that they did not actually have to allege that they saw ads during the class period. I think it should extend into the class period so that you're drawing a connection or otherwise somehow explaining it. It's just there has to be a connection to the purchases in the class period. You have to be misled within the class period. As I understand their connection is, you know, I've seen this for years, and I continue to buy because no one told me otherwise, essentially. If that's the claim. I suppose it's a different form of a disclosure allegation, which says there was an obligation to disclose because you had created this impression for so long that now you have an obligation to disclose it. Maybe that's the viable theory. Maybe it isn't, but it's within the class period. So if the failure to disclose claim is based on the existence of affirmative misrepresentations, you just sort of fall into the same issue where they have an alleged reliance on those affirmative misrepresentations with sufficient particularity. I understand that you're saying it's possible that there are sort of these old ads that stuck in your head and influenced you during the class period. The problem here is if you start breaking out the ads or identifying, I mean, for example, purity. For ads about purity, they have ads. I mean, if you've looked at the complaint, I think it's around paragraph 84 of the complaint where they just include a number of images of historical ads. They're very, very old. For purity, I think the last one is dated, the only one that even has the date, is dated 1985. We're talking about purchases three decades later. And even as to that 1985 ad, they didn't say that they saw it. So there's just no connection to the actual plaintiffs in this case here. If the Court has any questions about Prop 65. Yes. So what is your understanding of this is a form of preemption, essentially, that you can't have an allegation of a disclosure requirement that would otherwise be covered by Prop 65 that doesn't comply with Prop 65? And what's the basis for that? It's CELTEC. It's a California decision where the Court said that you can't plead around an absolute barrier to relief. The absolute barrier to relief here, it's principally the procedural requirements of Prop 65. The plaintiffs didn't provide 60 days notice. And one of their arguments is, well, some of the harms they're alleging aren't covered by Prop 65. What about that? Prop 65, as I recall, covers cancer and reproductive health. Yes, Your Honor. So I'm not sure what those harms are, and that's what the district court said when it was saying they hadn't sufficiently alleged that issues were false or misleading. If you look at their Prop 65 argument, I believe it's page 37 of their brief, they're explicitly saying they're talking about levels of contamination within Prop 65 safe harbor levels. And to the extent they're talking about inhalation risks, they don't really explain this argument in their brief. I think it's at 5 ER 940. The district court went through that and specifically said the bottle discloses inhalation risks, as in the risk that a child will accidentally aspirate the talc. And we sought judicial notice of those labels. You can see them at ECF 52 exhibits 1, 2, and 3 of the district court's docket. It's just not addressed in their brief. So to the extent that there is some non-cancer harm, I'm not sure what it is. I don't think it's been briefed. And even beyond that, we are talking about carcinogenic chemicals that they're alleging that are regulated by Prop 65. And so that's sort of how this case has been briefed and what it's been about. Beyond that, I think it's forfeited. All right. If the court has no further questions. Any additional questions? No. Judge? None. All right. Thank you. Thank you. Good morning. May it please the court. Karen Baumholt on behalf of Bausch Health U.S. LLC. I will be very brief, hopefully even less than the five minutes I've taken. You've heard all the reasons why these claims fail as to both defendants, but I'd like to focus very briefly on Bausch and the shower-to-shower product because there is no allegation throughout six iterations of this complaint as to anything that Bausch, my client, said about the shower-to-shower product. First, and there's no reliance on anything that my client, Bausch, said. So first, tobacco, too, as we've discussed, doesn't take away the element of reliance. But as to Bausch and shower-to-shower body powder, they have never alleged, these plaintiffs have never alleged, not once, that they relied on any statement by Bausch about shower-to-shower. And I would direct the court's attention to paragraphs 94 and 95 of the fifth amended complaint where plaintiffs tried to allege some sort of reliance on an ad campaign to the extent that they've done anything there. And I agree with my colleague here as to JJCI. They've really not alleged any reliance at all. What paragraph? 94 and 95. But where they at least make the attempt, it's with regard to baby powder and statements they claim Johnson & Johnson made. That's not my client, and it's not my client's product. There's not one word. Now, again, I agree with everything that my colleague representing JJCI had to say. But, again, any of the things that are missing there certainly don't work to Bausch and shower-to-shower. Plaintiff Gutierrez sues Bausch and doesn't even claim to have purchased that product, for example. Plaintiff Luna, the best that she does is claim that she relied on statements, unspecified statements, about baby powder and then somehow transposed those into shower-to-shower. That's the closest they ever come to talking about my client or the shower-to-shower product. I think it's kind of I saw what the ingredients were, and they're the same. So what Johnson & Johnson said about baby powder, I relied on to buy shower-to-shower. Yes and no. And the no part is they actually don't say, I saw those products, I compared those things, and they're the same. They say someone might do that, and someone might conclude, and someone might think it's reasonable to think these two things are the same. But never have they claimed that Plaintiff Luna actually did that. And it's the same problem that my colleague spoke of. There's actually, there's no allegation of actual reliance. What about the more general allegation of that by selling the products there was an attestation of merchantability and that Bausch was part of that? Well, they've not brought a warranty of merchantability claim under California code that would govern that, right? And they've not acclaimed a UCL claim under an unlawful prong. The problem is that's not the claim that's been asserted here. And it also can't be the case that simply selling a product then amounts to a false advertising claim or a UCL claim. And in fact, that's not the law. So, and again, as to lumping and the reasons why the district court specifically dismissed the claims as to our client, as to Bausch and the shower-to-shower product, is you just don't see it in this complaint. And if ever the Desfino cases and those cases that say you can't lump defendants were to apply, this would be the place. When you go paragraph after paragraph after paragraph, you see allegations about things that were done about in the 60s, in the 70s, in the 80s. It's alleged that Bausch purchased shower-to-shower in 2012. It is physically, temporarily impossible for Bausch to have made any statements or misstatements in the 60s, the 70s, the 80s, and the 90s. And I won't belabor the point, but simply saying that shower-to-shower has been sold for 50 years cannot be a misstatement about what is in the product or is not in the product. That's really the only argument that's been made as to Bausch and shower-to-shower is that we said it's been sold for 50 years and it keeps you fresh and smelling good. That's just not a misstatement of anything. Unless the court has further questions, I see my time is almost up. We'll submit on behalf of Bausch. Thank you, Your Honor. Thank you. All right. Thank you again for hearing me. Can you tell me again what paragraph in the complaint I should look at which most clearly has the allegations that you think are necessary here? Not on the disclosure issue. And then my second question is do you have a disclosure claim that is tied to the affirmative obligation to make a disclosure because of what was said previously? Those are two different questions. Right, right. I'm trying to catch my breath. But where in the complaint should I look again? I've been looking at paragraph 94. I'm not finding anything there, but maybe I'm missing something. So where should I be looking? I would say – I apologize. I would say probably start with 94, but then the next – All right. So where in 94? 94 is very long. Where in 94? There's a lot of statements about these ads that said that they were asbestos-free, but no one says that the – I gather those were later, and there's nothing that says that the plaintiffs had any connection to those ads. So what should I be looking at? Your Honor, and unfortunately, I don't have a copy of the Fifth Amendment complaint in front of me, but I would – That doesn't make a lot of sense. Everything we're talking about here is what's in the Fifth Amendment complaint. I understand. But it would start there. And, look, we – in terms of the reliance itself, we, again, trying to make sure that the allegations were not false, we did the best we could. And quite frankly, my clients – Maybe you need some different plaintiffs, but anyway, go ahead. It's possible, but quite frankly, my clients have no recollection of what was the first ad that they saw that induced them to buy the product. Again, these are products that were literally on the shelves for 100 years. They could have very well – it could have been that or it could have been an ad that their parents relied on, that their grandparents relied on. And that's kind of where we run into the in-rate tobacco 2 problem. Cut into the fact that you chose a certain kind of allegation. Maybe there's some other kind of lawsuit you could have brought, but this is about the representations that were made and what effect those representations had. Well, to that extent, we were somewhat boxed in by the ruling on Prop 65. Look, Prop 65 – and to circle back to that. The Prop 65 issue fundamentally – there are certain requirements for a label to be – requirements before a label can be placed based on the overall content of the product. And Bausch and Johnson & Johnson have made it very clear that they don't – they fall below that level. But there's also an element of deceptiveness in that consumers made it – were not given the opportunity to make a choice as to what the risk factors were. And we do raise that point over and over again that this is a risk factor issue, that no consumer would put that on their child if they thought it could be contaminated with asbestos. In terms of the simply selling a product being a representation or violation of unfair competition laws, that is actually a case. It's inter-asteroid hormone. We cite to it in our brief. The other part of it, though, is the idea that the Prop 65 is a direct bar to any claim of deceptiveness. Again, we're not seeking the penalties that are allowed under Prop 65. But any claim of deceptiveness for any harms, if those harms also include cancer, I think is a problem. And that's, again, where we're at here. This is largely – there were absolutely affirmative statements made, but this is also largely an omissions case. And I think the district court was wrong in its determination that Prop 65 was an absolute bar to that sort of cause of action. Thank you, counsel. Thank you. We appreciate the arguments of both sides. Thank you so much for that presentation. We will be in recess. We will submit this case at this time, and we will be in recess. All rise.
judges: BERZON, MENDOZA, Bolton